1
2
3
4
5
6
7
8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   ALPHONSO OLIPHANT, et al.,                No. C-08-5048 MMC

12              Plaintiffs,                    **ORDER GRANTING IN PART AND
                                              DENYING IN PART DEFENDANTS'**
13      v.                                     **MOTION FOR SUMMARY JUDGMENT**

14   CITY AND COUNTY OF SAN FRANCISCO,
     et al.,
15
                Defendants
16   _____/

17

18          Before the Court is defendants City and County of San Francisco ("City") and

19   William Siffermann's ("Siffermann") "Motion for Summary Judgment, or in the Alternative,

20   Partial Summary Judgment," filed January 22, 2010.  Plaintiffs Bruce Woodard

21   ("Woodard"), Roger Gainey ("Gainey") and Alphonso Oliphant ("Oliphant") have filed

22   opposition, to which defendants have replied.  Having read and considered the papers filed

23   in support of and in opposition to the motion, the Court rules as follows.[1]

24                              **BACKGROUND**

25          Plaintiffs are one former and two current employees of the San Francisco Juvenile

26   Probation Department ("the Department").  Each of said plaintiffs is African-American.

27   According to plaintiffs, each plaintiff sought a promotion and/or other employment

28   _____

          [1]By order filed March 31, 2010, the Court took the matter under submission.

1  opportunities, and was denied such opportunities "on the basis of [his] race and/or

2  ethnicity." (See Compl. ¶ 11.)  Based on such allegations, plaintiffs assert five causes of

3  action:  (1) First Cause of Action, titled "Discrimination in Violation of the Civil Rights Act of

4  1866 (42 U.S.C. section 1981 et seq.)";[2] (2) Second Cause of Action, titled "Discrimination

5  in Violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. section 2000 et seq.)"

6  ("Title VII"); (3) Third Cause of Action, titled "Discrimination in Violation of California Fair

7  Employment and Housing Act ["FEHA"] (California Gov't Code section 12900 et seq.)"; (4)

8  Fourth Cause of Action, titled "Discrimination in Violation of California Constitution Article 1,

9  section 8"; and (5) Fifth Cause of Action, titled "Intentional Infliction of Emotional Distress."

10  **LEGAL STANDARD**

11      Rule 56 of the Federal Rules of Civil Procedure provides that a court may grant

12  summary judgment "if the pleadings, the discovery and disclosure materials on file, and any

13  affidavits show that there is no genuine issue as to any material fact and that the movant is

14  entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(c).

15      The Supreme Court's 1986 "trilogy" of Celotex Corp. v. Catrett, 477 U.S. 317 (1986),

16  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), and Matsushita Electric Industrial Co.

17  v. Zenith Radio Corp., 475 U.S. 574 (1986), requires that a party seeking summary

18  judgment show the absence of a genuine issue of material fact.  Once the moving party

19  has done so, the nonmoving party must "go beyond the pleadings and by [its] own

20  affidavits, or by the depositions, answers to interrogatories, and admissions on file,

21  designate specific facts showing that there is a genuine issue for trial." See Celotex, 477

22  U.S. at 324 (internal quotation and citation omitted).  "When the moving party has carried

23  its burden under Rule 56(c), its opponent must do more than simply show that there is

24  some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586.  "If the

25  [opposing party's] evidence is merely colorable, or is not significantly probative, summary

26

27      [2]In their opposition, plaintiffs clarify that the First Cause of Action is based on 42
    U.S.C. § 1983, and, specifically, a claim of "racial discrimination."  (See Pls.' Opp. at 2:25-
28  27.)

1   judgment may be granted." Liberty Lobby, 477 U.S. at 249-50 (citations omitted).

2   "[I]nferences to be drawn from the underlying facts," however, "must be viewed in the light

3   most favorable to the party opposing the motion." See Matsushita, 475 U.S. at 587

4   (internal quotation and citation omitted).

5                                    **DISCUSSION**

6          The five causes of action addressed herein are based on a set of factual allegations

7   particular to each plaintiff and, in each instance, allege such plaintiff was subjected to

8   employment discrimination.  In their motion, defendants argue they are entitled to summary

9   judgment on all of plaintiffs' claims, for the asserted reason that plaintiffs lack evidence to

10  establish they were subjected to employment discrimination.  Further, with the exception of

11  the Fourth Cause of Action, defendants argue they are entitled to summary judgment,

12  irrespective of whether plaintiffs can raise a triable issue as to employment discrimination,

13  for additional asserted reasons.

14         The Court considers in turn the claims raised on behalf of each plaintiff.

15  **A.  Plaintiff Woodard**

16         Plaintiffs allege that Woodard is a "former San Francisco Juvenile Probation

17  Counselor" (see Compl. ¶ 44), who sought but not did receive a promotion as a "Deputy

18  Probation Officer" (see Compl. ¶ 55).  Further, plaintiffs allege, defendants denied

19  Woodard's two requests for "education leave" and his request to "change his position to on-

20  call status," even though defendants "routinely" granted such requests when made by other

21  employees.  (See Compl. ¶ 57.)

22         As noted, each of the five causes of action alleged in the instant case is based on

23  the theory that plaintiffs were subjected to employment discrimination.  In addressing the

24  merits of plaintiffs' claims that each plaintiff, including Woodard, was subjected to

25  employment discrimination, the parties have not distinguished among the five causes of

26  action.  Accordingly, as set forth below, the Court, in addressing the issue of discrimination,

27  likewise has not done so.

28  //

1          **1. Sufficiency of Evidence: Employment Discrimination**

2                   **a. Applicable Law**

3          Under the burden-shifting procedure set forth in <u>McDonnell Douglas Corp. v. Green</u>,

4   411 U.S. 792, 802 (1973), a plaintiff may establish a prima facie claim of discrimination

5   involving a failure to promote by showing "(1) [he] belongs to a protected class; (2) [he]

6   applied for and was qualified for the position [he] was denied; (3) [he] was rejected despite

7   [his] qualifications; and (4) the employer filled the position with an employee not of plaintiff's

8   class, or continued to consider other applicants whose qualifications were comparable to

9   plaintiff's after rejecting plaintiff."  <u>See</u> <u>Dominguez-Curry v. Nevada Transp. Dep't</u>, 424 F.3d

10  1027, 1037 (9th Cir. 2005).[3]  If the plaintiff establishes a prima facie case, the employer

11  must proffer a legitimate, non-discriminatory reason for its decision, and if the employer

12  does so, the plaintiff is then required to establish that the employer's proffered reason is

13  pretextual.  <u>See</u> <u>id.</u>  The Supreme Court has noted, however, that the <u>McDonnell Douglas</u>

14  framework "does not apply in every employment discrimination case."  <u>See</u> <u>Swierkiewicz v.</u>

15  <u>Sorema N.A.</u>, 534 U.S. 506, 511 (2002).  "For instance, if a plaintiff is able to produce direct

16  evidence of discrimination, he may prevail without proving all the elements of a [<u>McDonnell</u>

17  <u>Douglas</u>] prima facie case."  <u>Id.</u>

18          Here, plaintiffs argue they need not establish Woodard's claims under the <u>McDonnell</u>

19  <u>Douglas</u> framework, because they have direct evidence of discriminatory intent.

20  Specifically, plaintiffs rely on a comment made in October 2006 by defendant Siffermann,

21  the Chief Probation Officer, before an audience of approximately twenty persons, including

22  Woodard, who had assembled to take a written examination given as part of the selection

23  process for the position of Deputy Probation Officer.  During his deposition, Woodard

24  described the comment he heard as follows:  "As we waited for the analyst, Mr. Beringer, to

25

26          [3]Where, as here, a plaintiff bases a § 1983 claim against a government employer on
    a theory of racial discrimination, the "McDonnell Douglas framework is fully applicable."
27  <u>See</u> <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 506 n.1 (1993).  Further, the
    McDonnell Douglas framework is applicable to employment discrimination claims under
28  FEHA.  <u>See</u> <u>Guz v. Bechtel Nat'l Inc.</u>, 24 Cal. 4th 317, 354 (2000).

1    arrive to administer the test, the Chief began to speak, and he introduced himself and went

2    on to talk and make the statement that if there is anyone in here that is from the dark side,

3    meaning the Juvenile Hall, do not expect to be hired."  (See Springman Decl. Ex. M at

4    98:25-99:5.)[4]  Plaintiffs argue that the trier of fact could infer racial animus on the part of

5    Siffermann in light of such comment.  The Court disagrees.

6        First, the comment is not, on its face, racial.  Cf. Chuang v. University of California,

7    225 F.3d 1115, 1121, 1128 (9th Cir. 2000) (holding Chinese plaintiff, who alleged he was

8    not granted tenure on account of his race and ethnicity, submitted sufficient direct evidence

9    to support discrimination claim, where decisionmaker, when denying tenure to another

10   Chinese professor, "remarked that 'two Chinks' in the department were more than

11   enough").  "The dark side" is a well-known phrase in popular culture, having its origin in the

12   first, 1977, "Star Wars" film and pertaining to a dualistic philosophy.  See, generally,

13   http://en.wikipedia.org/wiki/Dark_side_(Star_Wars) ("The dark side is portrayed as the evil

14   aspect of the Force (by the Jedi Knights, who instead advocate using the light side of the

15   force), the Manichean mystical energy which permeates the universe.").  As Siffermann

16   explains it, "[b]ased on [his] strong views on the value of detention alternatives and

17   community based interventions, over the years, [he] [has] referred to the detention side of

18   operations, both in Cook County and in San Francisco, as 'the dark side,' a reference to

19   Star Wars."  (See Siffermann Decl. ¶ 17.)[5]

20       Second, to the extent the comment could be viewed as ambiguous, plaintiffs have

21   not submitted any evidence to support an inference that, in the context in which the

22   statement was made, Siffermann was in fact referring to the race or ethnicity of any

23   _____

24   [4]In his declaration, Siffermann described the comment as follows:  "[F]or those of
     you who are from the dark side of Juvenile Hall, this may not be the job for you."  (See
25   Siffermann Decl. ¶ 17.)

26   [5]According to Siffermann, before he was appointed as Chief Probation Officer in San
     Francisco, he worked in Cook County, Illinois, where he "was a key participant in the
27   development of various programs and initiatives specifically designed to reduce over-
     reliance upon secured detention and reduce the disproportionate representation of minority
28   youth in the juvenile justice system, while increasing the accountability of youths in the
     juvenile justice system."  (See id. ¶ 3.)

1    person.  Cf., e.g., Fite v. Comtide Nashville, LLC, 2010 WL 668288, *2, *12 (M.D. Tenn.

2    2010) (holding where manager told African-American plaintiff that manager "planned to

3    'lighten up the place',"  plaintiff offered sufficient evidence from which trier of fact could infer

4    racial animus therefrom, specifically, evidence that when "Caucasian" applicants arrived

5    shortly after manager made the subject comment, manager stated, "this is what I'm talking

6    about").  Indeed, Woodard stated at his deposition that he understood Siffermann's

7    reference to "the dark side" to be a reference to "Juvenile Hall."  (See Springman Decl. Ex.

8    M at 98:25-99:5.)

9        Accordingly, plaintiffs have not shown they can avoid proceeding under the

10   McDonnell Douglas framework.

11                    **b. Alleged Adverse Employment Actions**

12                    **(1)  January 2007 Failure to Promote**

13       In their complaint, plaintiffs allege that the Department interviewed Woodard in

14   December 2006 for a promotion to the position of Deputy Probation Officer,[6] and that when

15   the selections were later announced in 2007, the Department did not promote Woodard.

16       Defendants argue that Woodard, who at the time in question was a Juvenile

17   Probation Counselor, cannot establish a prima facie case of discrimination, because, in

18   defendants' words, "Woodard was not as qualified as others to advance through the

19   examination process."  (See Defs.' Mot. at 10:3-5.)  In support thereof, defendants offer

20   evidence, undisputed by plaintiffs, that Woodard, after taking and passing a "written

21   proficiency test" administered by the Department in 2006, was "invited to the oral portion of

22   the selection process," along with the other applicants who had passed the written test.

23   (See Houston Decl. Ex. A, second unnumbered page.)  Likewise, it is undisputed that

24   Woodard thereafter was orally interviewed by a panel of three persons, and that when the

25   two positions then available were later filled in January 2007, he did not receive one (see

26   _____

27       [6]Although the complaint alleges that the Department interviewed Woodard on
     "December 12, 2005" (see Compl. ¶ 51), the evidence offered by both parties indicates that
28   the referenced interview was conducted on December 12, 2006 (see Houston Decl. Ex. A,
     second unnumbered page; Springman Decl. Ex. Q).

1   id. Ex. A, third unnumbered page; Springman Decl. Ex. M at 128); rather, according to

2   defendants, and undisputed by plaintiffs, the Department selected two individuals,

3   specifically, Lorena Deras, whom defendants describe as "Hispanic," and Viviann Green,

4   whom defendants describe as "African-American" (see Houston Decl. Ex. A, second and

5   third unnumbered pages).

6       Defendants, however, offer no evidence to support a finding that Woodard was not,

7   as a matter of objective criteria, qualified to be a Juvenile Probation Officer, nor have

8   defendants asserted, let alone demonstrated, that Woodard lacks evidence to support such

9   a finding.  See Nicholson v. Hyannis Air Service, Inc., 580 F.3d 1116, 1123 (9th Cir. 2009)

10  (holding "objective" and not "subjective" criteria applicable when determining, for purposes

11  of prima facie case, whether plaintiff "qualified" for position sought).  To the extent

12  defendants are asserting that other applicants were more qualified, such argument, as

13  discussed immediately below, pertains not to plaintiffs' burden to make out a prima facie

14  case, but, rather, to whether defendants have met their burden to identify the existence of a

15  legitimate, non-discriminatory reason for the non-selection.[7]

16      In that respect, defendants argue "the candidates who were appointed performed

17  better in the competitive exam process."  (See Defs.' Mot. at 10:7.)  The evidence offered

18  by defendants pertaining to the "competitive exam process" is found in a letter written by

19  Louise Brooks Houston ("Houston") to the Equal Employment Opportunity Commission

20  ("EEOC"), in which Houston, on behalf of the Department, responded to an EEOC charge

21  filed by Woodard.  In her declaration submitted in support of the instant motion, Houston

22  states that she "gathered information," from persons unidentified in either her declaration or

23  in her letter to the EEOC, that she then made an "assessment of the information gathered,"

24

25      [7]As discussed above, to establish a prima face case, the plaintiff must show that "the
26  employer filled the position with an employee not of plaintiff's class, or continued to
    consider other applicants whose qualifications were comparable to plaintiff's after rejecting
27  plaintiff."  See Dominquez-Curry, 424 F.3d at 1037.  Plaintiffs have not offered evidence to
    dispute defendants' evidence that one of the two persons selected in January 2007 for then
28  open positions is African-American.  Nonetheless, one of the persons selected is not
    African-American.

1   and that, on behalf of the Department, she "denied" the allegations made by Woodard to

2   the EEOC.  (See Houston Decl. ¶ 3.)

3       In her letter to the EEOC, Houston stated that twenty-two persons, including

4   Woodard, were interviewed, that each such interview was conducted by one of two panels,

5   each composed of three persons, and that, after the interviews, Woodard was "ranked No.

6   15 out of 20" and given a score of "315."[8]  (See id. Ex. A, third unnumbered page.

7   According to Houston, because the ten persons who received the highest score on the

8   interview were invited back for a second interview, Woodard did not further participate in

9   the "selection process."  (See id.)  Other than stating that the ranking was "determined by

10  the Department's competitive testing process" (see id.), Houston provided therein no

11  information as to how the rankings were determined.

12      In their opposition, plaintiffs argue that "the criteria proffered by the City for

13  determining promotions was completely subjective" (see Pls.' Opp. at 19:27-28), and rely

14  on authority holding that where an employer relies on "subjective" criteria when making

15  employment decisions, a court considering a claim of employment discrimination must give

16  such criteria "close scrutiny."  See Jauregui v. City of Glendale, 852 F.2d 1128, 1135-36

17  (9th Cir. 1988) (holding "close scrutiny" of subjective selective criteria necessary given "the

18  potential for manipulation inherent in the use of subjective evaluations").

19      Defendants offer no evidence as to the criteria, subjective or otherwise, the panel

20  used to rank the applicants who were interviewed.  Consequently, it is not possible for the

21  Court to scrutinize in any manner the criteria employed by the Department when it did not

22  select Woodard for a promotion.  Further, Houston's personal "assessment" that no

23  discrimination occurred (see Houston Decl. ¶ 3), is wholly irrelevant, particularly given that

24  she does not claim to have taken any part in the selection process.

25  //

26  //

27  ———————————

28      [8]Houston does not explain how, if twenty-two persons were interviewed, only twenty
    were given scores.

8

1    Accordingly, defendants have failed to offer evidence sufficient to support a finding

2    that the Department had a legitimate, non-discriminatory basis for their decision not to

3    promote Woodard in January 2007.

4                                    **(2) July 2007 Non-Selection**

5    It is undisputed that in March 2007, Woodard resigned from his job with the

6    Department.  (See Doyle Decl. Ex. G; Springman Decl. Ex. CC.)  It is also undisputed that

7    thereafter, in April 2007, the Department informed Woodard it had available Deputy

8    Probation Officer positions (see Springman Decl. Ex. S), that Woodard applied and was

9    given an interview (see id. Ex. M at 129), and that the Department, in July 2007, advised

10   Woodard he had not been selected for one of the open positions (see id. Ex. T).

11   In their motion, defendants do not specifically address the July 2007 non-selection,

12   but do offer Houston's declaration, attached to which is a copy of her letter to the EEOC, in

13   which she includes information concerning the July 2007 non-selection.  Specifically,

14   Houston's letter to the EEOC indicated that twenty-five persons, including Woodard, were

15   interviewed by a panel of four persons, and that, after the interviews, Woodard received a

16   score of "1135 with 1200 as the highest score."  (See Houston Decl. Ex. A, third and fourth

17   unnumbered pages.)  Houston provided therein no information as to how the score was

18   determined.  Houston further stated that six persons, none of whom she described as

19   African-American, were ultimately selected,[9] and that the Department selected the persons

20   "it believed to be the most qualified following a competitive process."  (See id. Ex. A, fourth

21   unnumbered page.)

22   For the reasons stated above with respect to the Department's failure to promote

23   Woodard in January 2007, the Court finds Houston's declaration and attached letter do not

24   constitute sufficient evidence to warrant summary judgment.  Again, other than Houston's

25   personal assessment that she believes the Department did not discriminate against

26   _____

27        [9]According to Houston, three of the six persons selected were "Asian/Pacific
     Islander," while the other three were, respectively, "Caucasian," "Hispanic," and "Filipino."
28   (See id. Ex. A, fourth unnumbered page.)

1    Woodard on the basis of his race (see id.), nothing in Houston's declaration or letter

2    identifies the criteria used by the panel, and, consequently, Houston fails to offer a

3    sufficient reason or reasons, whether objective or subjective, as to why Woodard was not

4    selected.

5           Accordingly, defendants have failed to offer evidence sufficient to support a finding

6    that the Department had a legitimate, non-discriminatory basis for its decision not to select

7    Woodard in July 2007.

8                            **(3)  Request for Leave of Absence**

9           In their complaint, plaintiffs allege that Woodard requested he be given a leave of

10   absence on two occasions and that both requests were denied.  (See Compl. ¶ 57.)

11          It is undisputed that Woodard, on February 26, 2007, requested a one-year

12   "personal leave" for, in Woodard's words, "professional development," and that the request

13   was denied on February 28, 2007 by Woodard's supervisor, Dennis Doyle ("Doyle").  (See

14   Doyle Decl. Ex. A; Springman Decl. Ex. Z.)  In a memorandum written by Doyle explaining

15   the denial, Doyle stated that the Department was "critically short of counseling staff," was

16   "spending record-breaking amounts of overtime to backfill Counselor positions," and had

17   not been able to hire permanent Counselors for "almost five years."  (See Doyle Decl. Ex.

18   C; Springman Decl. Ex. Z.)  It is also undisputed that thereafter, on March 8, 2007,

19   Woodard requested a six-month "personal leave," again, for "professional development,"

20   and that the second request was denied by Doyle on March 15, 2007 for the same reasons

21   as those supporting his denial of Woodard's first request.  (See Doyle Decl. Ex. D;

22   Springman Decl. Ex. AA.)  Additionally, defendants offer evidence, undisputed by plaintiffs,

23   that Woodard advised Doyle that he wanted the above-referenced personal leaves

24   because he had been offered a job with another law enforcement agency and was, in

25   Doyle's words, "concerned about the probationary period for his new position."  (See Doyle

26   Decl. ¶ 5.)

27          In their motion for summary judgment, defendants argue the above-described

28   "chronic staff shortages in Juvenile Hall" (see Defs.' Mot. at 7:21-26) constitute a legitimate,

                                             10

1    non-discriminatory basis for Doyle's denials of Woodard's requests,[10] and plaintiffs, in their

2    opposition, do not contend such explanation ordinarily would not constitute a legitimate and

3    non-discriminatory reason therefor.  Rather, plaintiffs assert that two other employees in

4    the Department, specifically, Damon Burris ("Burris") and Chris Griffin ("Griffin") were

5    granted leaves of absence.  Although not clearly expressed, plaintiffs appear to argue that

6    if other employees in the Department were granted personal leaves, the true reason for

7    Woodard's denial was not a staffing shortage.  As defendants correctly point out, however,

8    plaintiffs offer no evidence from which a trier of fact could infer that Burris or Griffin were

9    granted personal leaves.  Further, with respect to Burris, defendants offer evidence,

10   undisputed by plaintiffs, that although Burris did not work for "a month or six weeks or so" in

11   2005 or 2006, he was not granted a personal leave, but, rather, he used up his "accrue[d]

12   vacation hours" and "compensatory time."  (See Lucas Decl. Ex. B at 66-66.)

13       Accordingly, to the extent plaintiffs' claims are based on the Department's denials of

14   Woodard's requests for personal leave, defendants have shown they are entitled to

15   summary judgment.

16                           **(4)  Request for Transfer to On-Call Position**

17       In their complaint, plaintiffs allege that Woodard "requested to change his position to

18   on-call status," and that such request was denied.  (See Compl. ¶ 57.)  Although the

19   complaint does not identify the individual(s) who denied the request, plaintiffs, with their

20   opposition, offer evidence that Doyle told Woodard that Woodard's request was denied.

21   (See Springman Decl. Ex. M at 139.)

22       The undisputed evidence in the record reflects that Woodard, on March 20, 2007,

23   requested in writing a "transfer in title," specifically, from a "permanent" counselor to an "on-

24   call" counselor."  (See Doyle Decl. Ex. F.)  In their motion, defendants neither argue that

25   plaintiffs cannot establish a prima facie case of discrimination as to such claim, nor offer

26

27       [10]Neither defendants, in their motion, nor plaintiffs, in their opposition, address the
     type of circumstantial evidence a plaintiff would need in order to establish a prima facie
28   discrimination claim based on a failure to grant a request for a leave of absence.

1   any evidence that sets forth the reasons why Doyle, or any other person who denied the

2   request for a transfer in title,[11] denied the request.

3        Accordingly, to the extent plaintiffs' claims are based on the Department's denial of

4   Woodard's request to work as an "on-call" counselor, defendants have failed to offer

5   evidence sufficient to support a finding that the Department had a non-discriminatory basis

6   for its decision not to grant Woodard's request for such transfer.

7                 **c.  Conclusion: Sufficiency of Evidence of Discrimination**

8        To the extent Woodard's claims are based on the denial of Woodard's requests for

9   personal leave, defendants have shown they are entitled to summary judgment; to the

10  extent Woodard's claims are based on a failure to promote/select Woodard for the position

11  of Deputy Probation Officer and failure to transfer Woodard to an "on-call" position,

12  defendants have failed to show plaintiffs' evidence is insufficient to raise a triable issue as

13  to whether discrimination played a role in such decisions.

14            **2.  Additional Arguments**

15       As noted, defendants, as to four of plaintiffs' five causes of action, argue they are

16  entitled to summary judgment irrespective of whether plaintiffs can establish a claim of

17  employment discrimination.[12]  The Court next considers these additional arguments as they

18  pertain to Woodard's failure-to-promote, failure-to-select, and failure-to-transfer claims.

19  //

20

21       [11]Although defendants apparently disagree with plaintiffs' assertion that the decision
22  was made by Doyle, defendants offer no evidence as to a different decision-maker and, in
    any event, at the summary judgment stage, the Court resolves factual disputes in favor of
23  the non-moving party.

24       [12]Defendants do not argue they are entitled to summary judgment on the Fourth
    Cause of Action, by which plaintiffs allege a violation of Article I, § 8 of the California
25  Constitution, for any reason other than a failure to establish an act of discrimination.  The
    Court notes that no party has addressed the Ninth Circuit's holding in Strother v. Southern
26  California Permanente Medical Group, 79 F.3d 859 (9th Cir. 1996), in which the Ninth
    Circuit held that "a claim brought directly under Article I, § 8 of the California Constitution
27  may only be brought where a plaintiff has been denied entrance into a profession or
    particular employment or terminated from the same," and does not apply to claims of
28  "discrimination in the conditions of employment" nor "reach conduct affecting particular
    aspects of an individual's job."  See id. at 871-73.

1

### a. First Cause of Action

2    The First Cause of Action alleges a deprivation of rights under 42 U.S.C. § 1983.

3  Defendants argue they are entitled to summary judgment thereon because Siffermann is

4  entitled to qualified immunity and because plaintiffs lack evidence to show that any adverse

5  employment action was taken pursuant to a policy or practice of the Department.

6

### (1) Siffermann

7    "The doctrine of qualified immunity protects government officials 'from liability for civil

8  damages insofar as their conduct does not violate clearly established statutory or

9  constitutional rights of which a reasonable person would have known.'" Pearson v.

10  Callahan, 129 S. Ct. 808, 815 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818

11  (1982)).  To determine whether a government official is entitled to qualified immunity, a

12  "two-step sequence" is "often appropriate."  See id. at 815, 818.  First, the court determines

13  whether the facts "show that the [official's] conduct violated a constitutional right."  See id.

14  at 816.  If not, the official is entitled to qualified immunity, and, if so, the court determines

15  whether "the right was clearly established."  See id.

16    Here, defendants offer evidence, undisputed by plaintiffs, that Siffermann did not

17  participate in the decision not to promote or select Woodard for the position of Deputy

18  Probation Officer (see Siffermann Decl. ¶ 18), and, as discussed above, plaintiffs contend,

19  and offer evidence to support a finding, that Doyle made the decision to deny Woodard's

20  request to work on an on-call basis.  In short, there is no evidence in the record to support

21  a finding that Siffermann personally had a role in any of the alleged adverse employment

22  decisions made with respect to Woodard.  See Taylor v. List, 880 F.2d 1040, 1045 (9th Cir.

23  1989) ("Liability under section 1983 arises only upon a showing of personal participation by

24  the defendant.").  Because there is no evidence to support a finding that Siffermann

25  "violated a constitutional right" held by Woodard, defendants have shown, at the "first step"

26  of the qualified immunity analysis, that Siffermann is entitled to qualified immunity.  See

27  Pearson, 129 S. Ct. at 816.

28  //

1   Accordingly, to the extent the First Cause of Action is brought on behalf of Woodard

2   and against Siffermann, defendants are entitled to summary judgment.

3              **(2)  The City**

4   Defendants contend plaintiffs cannot establish a civil rights deprivation claim against

5   the City, for the asserted reason that plaintiffs lack evidence to demonstrate the alleged

6   discrimination to which Woodard was subjected was taken pursuant to a policy or custom

7   of the Department.  See Villegas v. Gilroy Garlic Festival Ass'n, 541 F.3d 950, 964 (2008)

8   (holding government entity entitled to summary judgment on civil rights deprivation claim,

9   where plaintiff cannot demonstrate employee who deprived plaintiff of federal right "acted

10  pursuant to a governmental policy or custom").  The Court agrees.

11  First, the complaint does not allege that the adverse employment decisions to which

12  Woodard is alleged to have been subjected were taken pursuant to any departmental policy

13  or custom.  Moreover, defendants have offered statistics demonstrating that, during the

14  period of July 1, 2006 through June 30, 2008, 58% of the persons promoted in the

15  Department were African-American and 33% of persons newly-hired by the Department

16  were African-American, a percentage higher than for "any other racial or ethnic group."

17  (See Magee Decl. ¶ 14, Ex. F.)  Lastly, plaintiffs have neither contested the statistical

18  showing made by defendants, nor offered any evidence demonstrating that plaintiffs

19  nonetheless can establish that the Department has a policy or custom of failing to provide

20  equal employment opportunities for African-Americans.  Indeed, plaintiffs, in their

21  opposition, make no argument as to why the City can be held liable on plaintiffs' claims

22  under § 1983.

23  Accordingly, to the extent the First Cause of Action is brought on behalf of Woodard

24  and against the City, defendants are entitled to summary judgment.

25              **b.  Second Cause of Action**

26  In the Second Cause of Action, plaintiffs allege a violation of Title VII.

27  At the outset, defendants argue that Woodard's failure to obtain a right-to-sue letter

28  prior to filing the instant action constitutes a bar to Woodard's Title VII claim.  See Surrell v.

14

1  California Water Service Co., 518 F.3d 1097, 1105 (9th Cir. 2008) (holding failure to

2  receive "federal right-to-sue letter" not jurisdictional but "general requirement of a federal

3  right-to-sue letter remains").  In that regard, defendants point out that, as of the time they

4  filed their motion, the Equal Employment Opportunity Commission ("EEOC") still had the

5  matter under investigation and, consequently, had not issued a right-to-sue letter to

6  Woodard.  (See Lucas Decl. Ex. H, nineteenth unnumbered page.)  Subsequent to the filing

7  of defendants' motion, however, the EEOC issued a right-to-sue letter to Woodard (see

8  Supp. Woodard Decl. Ex. A), which issuance, as Woodard correctly notes, cures the

9  deficiency.  See Wrighten v. Metropolitan Hospitals, Inc., 726 F.2d 1346, 1351 (9th Cir.

10  1984) (holding lawsuit filed before receipt of right-to-sue letter is "premature" but deficiency

11  "cured" where right-to-sue letter received before trial).

12       Consequently, to the extent defendants rely on Woodard's failure to obtain a right-to-

13  sue letter prior to his filing the instant action, defendants have not shown they are entitled

14  to summary judgment on the Second Cause of Action.

15       As defendants correctly argue, however, and plaintiffs offer no disagreement

16  therewith, a Title VII claim cannot be maintained against Siffermann.  See Miller v.

17  Maxwell's Int'l, Inc., 991 F.2d 583, 587 (9th Cir. 1993) (holding "individual defendants

18  cannot be held liable for damages under Title VII").

19       Accordingly, to the extent the Second Cause of Action is brought on behalf of

20  Woodard and against Siffermann, defendants have shown they are entitled to summary

21  judgment, and to the extent said Cause of Action is brought against the City, defendants

22  have not shown they are entitled to summary judgment.

23              **c. Third Cause of Action**

24       In the Third Cause of Action, plaintiffs allege a violation of FEHA.

25       As defendants correctly argue, and plaintiffs offer no dispute, a FEHA claim cannot

26  be maintained against Siffermann.  See Reno v. Baird, 18 Cal. 4th 640, 663 (1998) (holding

27  "individuals who do not themselves qualify as employers may not be sued under the FEHA

28  for alleged discriminatory acts").

15

Accordingly, to the extent the Third Cause of Action is brought on behalf of Woodard and against Siffermann, defendants are entitled to summary judgment.

### d.  Fifth Cause of Action

In the Fifth Cause of Action, plaintiffs allege a claim for intentional infliction of emotional distress.

Under the California Government Claims Act, to maintain "any tort claim" against a public entity, a plaintiff must present the claim to such entity in accordance with the procedural requirements set forth therein.  See Crow v. State of California, 222 Cal. App. 3d 192, 199 (1990).  A plaintiff's failure to comply with the claim presentation requirement is a bar to maintaining state law tort claims against a governmental entity and its employees. See Ortega v. O'Connor, 764 F.2d 703, 707 (9th Cir. 1985), rev'd in part on other grounds, 480 U.S. 709 (1987).

Here, defendants offer evidence, undisputed by plaintiffs, that Woodard, prior to filing the instant action or at any other time, failed to submit the requisite claim.  (See Rothschild Decl. ¶ 4.)

Accordingly, to the extent the Fifth Cause of Action is brought of behalf of Woodard, defendants are entitled to summary judgment.

## B.  Plaintiff Gainey

Plaintiffs allege that in 2007, Gainey, who was at that time a Deputy Probation Officer, applied for and did not receive a promotion to the position of Supervising Probation Officer.  (See Compl. ¶ 33, 36, 39.)  Plaintiffs also allege that in March 2008, Gainey received a promotion as a Supervising Probation Officer, but that the promotion was "in name only."  (See Compl. ¶ 41.)

### 1.  Sufficiency of Evidence: Employment Discrimination

#### a.  2007 Failure to Promote

Defendants offer evidence, undisputed by plaintiffs, that on January 23, 2007, the City, through its Department of Human Resources ("DHR") announced it was accepting applications for the civil service position of Supervising Probation Officer.  (See Horan Decl.

16

1   ¶ 8, Ex. A at 00084.)  As set forth in the DHR's announcement, applicants would be given

2   an "oral/performance examination" by the DHR, which examination could include a "written

3   exercise" (see id. Ex. A at 00085); the purpose of the DHR's examination was to enable the

4   DHR to establish an "eligible list" of persons who could be selected to fill the position of

5   Supervising Probation Officer (see id. ¶ 4).  The announcement further provided that after

6   the DHR had conducted such examination, the "hiring department," i,e, the Juvenile

7   Probation Department, could "conduct additional selection processes to make final hiring

8   decisions."  (See id. Ex. A at 00086.)

9        The evidence is undisputed that the DHR subsequently administered its examination

10   in "two parts," specifically, a "written qualification portion" administered on March 13, 2007,

11   and an "oral portion" administered on March 15 and 16, 2007 (see id. ¶ 9), and that

12   Siffermann had no role in the administration of either the oral or written part of the DHR's

13   examination and had no knowledge of any of the questions therein.  (See Siffermann Decl.

14   ¶ 6.)  It also is undisputed that on April 17, 2007, the DHR issued an "eligible list,"

15   specifically, a list of twenty-four persons who had taken the DHR's examination, each of

16   whom received a "rank" from 1 to 18,[13] and that Gainey was ranked No. 1.  (See Horan

17   Decl. Ex. A at 00089; Springman Decl. Ex. C.)

18        Additionally, defendants offer evidence, undisputed by plaintiffs, that in 2007, the

19   Department had "four approved requisitions" (see Nance Decl. ¶ 6), meaning the

20   Department could select four persons for the position of Supervising Probation Officer (see

21   id.).  Defendants also offer evidence, undisputed by plaintiffs, that "all interested persons"

22   on the ranked list of applicants, including Gainey, were interviewed by Siffermann and Allen

23   Nance, the Assistant Chief Probation Officer,[14] and that, following those interviews,

24

25        [13]It appears that six of the applicants received, essentially, a tied rank with one or
26   more of the other applicants.  (See Horan Decl. Ex. A at 00089.)

27        [14]Although neither party expressly provides the number of applicants interviewed by
     Siffermann and Nance, it appears from Siffermann's notes, taken at the time, that
28   interviews of twenty-three of the twenty-four persons on the eligible list were conducted.
     (See Siffermann Decl. Ex. E.)

Siffermann selected four individuals for the then open positions of Supervising Probation Officer.  (See id. ¶ 9; Siffermann Decl. ¶ 11.)  As shown by defendants' evidence, and undisputed by plaintiffs, Siffermann selected Ernestine Cade-Hill ("Cade-Hill"), whom defendants describe as "African-American," Sarah Schumann ("Schumann"), whom defendants describe as "of Hispanic descent," Gary Levene ("Levene"), whom defendants describe as "Caucasian," and Dennis Fuata ("Fuata"), whom defendants describe as "Pacific-Islander."  (See Nance Decl. ¶ 9.)

Defendants contend plaintiffs cannot establish a racially discriminatory motivation for their decision not to select Gainey for one of the four available positions as a Supervising Probation Officer.  In particular, defendants argue, defendants have articulated a legitimate, non-discriminatory reason for Siffermann's decision to select other individuals, and plaintiffs lack evidence to support a finding that such reasons are a pretext for racial discrimination.[15]

In support of their argument, defendants offer Siffermann's declaration, in which he states that each of the persons he and Nance interviewed in 2007 was asked "the same series of questions," which questions were directed to the applicant's "job experience" and "views of the juvenile justice system," as well as how the applicant "would handle certain situations."  (See Siffermann Decl. ¶¶ 9, 10, Ex. B.)  Defendants also offer Siffermann's deposition testimony, in which he explained why he selected the persons given the Supervising Probation Officer position in 2007, and why he did not select Gainey at that time.  Specifically, Siffermann testified that he selected Schumann because of "her knowledge of the job," "her understanding of the law," "her understanding of the vision of the least restrictive intervention or placement that did not compromise [the] public safety part of the detention alternatives initiative," and "her ability to communicate [and] be direct." (See Lucas Decl. Ex. D at 95-96.)  Siffermann testified he selected Levene because, in Siffermann's view, "he possessed the knowledge, experience, leadership and vision . . .

---

[15]Defendants do not argue that Gainey is unable to establish a prima facie case.

18

1    that was most consistent with what [Siffermann] felt a good supervisor needed to possess,

2    particularly with his understanding of the unit [for which] he eventually was appointed as

3    supervisor."  (See id. Ex. D at 95.)  Siffermann testified he selected Fuata because Fuata

4    had demonstrated "skill in managing his subordinate staff" at the time Fuata previously had

5    worked as an "acting supervisor," and because his "style" of management was, in

6    Siffermann's experience, "compatible with extracting the positive outputs of personnel but

7    at the same time able to hold officers accountable." (See id. Ex. D at 97-98.)[16]  Additionally,

8    Siffermann testified that he did not select Gainey for a supervisory position in 2007

9    because he believed Gainey was "a little bit soft spoken and maybe not as definitive," and

10   had not "demonstrated any leadership."  (See id. Ex. D at 100.)

11        The Court finds Siffermann's stated grounds for not selecting Gainey in 2007 for a

12   Supervising Probation Officer position constitute legitimate and non-discriminatory reasons

13   for the non-selection; plaintiffs do not argue to the contrary.  Rather, plaintiffs argue that, for

14   several reasons, plaintiffs can establish Siffermann's stated grounds were a pretext for

15   racial discrimination.[17]  As discussed below, the Court disagrees.

16        First, plaintiffs argue, the Department should have selected the persons who scored

17   the highest on the examination administered by the DHR, i.e., the examination

18   administered to create the eligible list, rather than make decisions based on the interviews

19   conducted by Siffermann.  In other words, plaintiffs argue, the Department should have

20   employed different selection criteria than those actually employed.  Plaintiffs cannot create

21   a triable issue of fact as to pretext, however, by arguing they would have been selected if

22   plaintiffs' own choice of criteria had been employed.  See Cotton v. City of Alameda, 812

23

24        [16]The fourth person selected in 2007 was Cade-Hill, who is African-American.

25   Siffermann testified she was selected because she had a "wealth of experience" and during
     her interview she "brought out some great perspectives . . . on management of personnel

26   and her approach to the job of being a supervisor."  (See id. Ex. D at 96.)

27        [17]To the extent plaintiffs, in relying on Siffermann's "dark side" comment, assert they
     need not establish their claims under the McDonnell Douglas framework, the Court, for the

28   reasons stated above with respect to plaintiffs' claims brought on behalf of Woodard,
     disagrees.

19

1   F.2d 1245, 1249 (9th Cir.1987) (holding plaintiff cannot demonstrate pretext by asserting

2   employer should have used different criteria; observing federal discrimination laws "do[ ]

3   not make it unlawful for an employer to do a poor job of selecting employees," but, rather,

4   "make[ ] it unlawful to discriminate on the basis of [a protected class]").

5       Second, plaintiffs argue pretext can be inferred because the Department assertedly

6   changed the "certification rule" applicable to persons listed on the eligible list after the

7   rankings were known.  Under the San Francisco Civil Service Rules, when a civil service

8   position becomes available, the DHR must "certify to the appointing officer the names of

9   eligibles that are reachable within the applicable certification rule." See San Francisco Civil

10  Service Rule 111A.28.1.[18]  If the City and the employees' union do not agree to a different

11  certification rule, the "Rule of Three Scores shall be used exclusively." See San Francisco

12  Civil Service Rule 111A.30.3.  Under the Rule of Three Scores, where more than one

13  position is available, "the number of scores certified shall be equal to the number of

14  positions to be filled plus the number of scores in the certification rule minus one." See San

15  Francisco Civil Service Rule 111A.29.2.

16      Here, defendants offer evidence that, as of the time the DHR administered its

17  examination, the City and the employees' union, the Supervising Probation Officers'

18  Association ("SPOA"), had not decided upon the certification rule that would apply (see

19  Horan Decl. ¶ 8), and that before the results were known, the City and the SPOA agreed to

20  the "Rule of the List" (see id. Ex. A at 00082), which rule provides that the "appointing

21  officer" can "select anyone from the list" and is "free to inquire further about a candidate's

22  experience" (see id. ¶ 6).  Plaintiffs fail to offer any evidence that any person representing

23  either the City or the SPOA was aware of the results of the examination at the they agreed

24  to the Rule of the List, or that Siffermann had any input into, or even awareness of, the

25  negotiations between the City and the SPOA regarding which certification rule would apply

26  to the eligible list.  Moreover, even if the Rule of Three Scores had been applied to the four

27  ─────────────

28      [18]Defendants' request for judicial notice of the Civil Service Rules (see Defs.' Req.
    for Judicial Notice Ex. A) is not opposed by plaintiffs, and is hereby GRANTED.

1    positions at issue, in which case the Department would have been required to select

2    persons ranked Nos. 1 through 6 on the eligible list,[19] each person selected in 2007 would

3    have been "reachable," because it is undisputed that Schumann and Levene were both

4    ranked No. 3, Cade-Hill was ranked No. 5, and Fuata was ranked No. 6.  (See id. Ex. A at

5    00089; Springman Decl. Ex. C.)

6         Third, plaintiffs argue that "at the time [defendants] refused promotions to [plaintiffs],

7    the [ ] Department had not hired an African-American supervisor in over 20 years."  (See

8    Pls.' Opp. at 1:11-13.)  Plaintiffs cite no evidence to support such assertion.  (See id.)

9    Moreover, defendants offer evidence, undisputed by plaintiffs, that Siffermann did not begin

10   working for the Department until April 2005 (see Siffermann Decl. ¶ 1), and plaintiffs fail to

11   explain why the hiring practices of prior Chief Probation Officers, even if such practices

12   were as asserted by plaintiffs, tend to prove that Siffermann's stated non-discriminatory

13   reasons for not selecting Gainey were a pretext for racial animus on his part.  Further, as

14   discussed above, plaintiffs have offered no evidence to dispute defendants' showing that

15   during the two-year period in which plaintiffs are alleged to have been subjected to adverse

16   employment decisions, 58% of the persons promoted by Siffermann were African-

17   American.

18        Finally, plaintiffs rely on various employment decisions made with respect to other

19   employees whom plaintiffs describe as African-American.  In particular, plaintiffs offer

20   evidence that in December 2007, Lonnie Holmes ("Holmes") was selected by Siffermann to

21   be "Director of Community Programs," but that "within months," Siffermann "eliminated

22   many of [Holmes's] duties," and, in 2009, eliminated the position of Director of Community

23   //

24   //

25

26        [19]As noted, under the Rule of Three Scores, "the number of scores certified shall be

27   equal to the number of positions to be filled plus the number of scores in the certification
     rule minus one."  See San Francisco Civil Service Rule 111A.29.2.  Thus, where, as here,

28   four positions were to be filled, the Department was allowed to make selections from
     persons who were ranked No. 1 through No. 6 on the eligible list (4 + 3 - 1).

1    Programs from the Department's budget.  (See Holmes Decl. ¶¶ 8, 10, 11.)[20]  Additionally,

2    plaintiffs assert that in 2008, the Department "eliminated three Supervising Counselors from

3    Juvenile Hall," each position held by an African-American.  (See Pls.' Opp. at 10:20-22.)[21]

4    In arguing such evidence supports a finding that Siffermann's stated reasons for not

5    promoting Gainey in 2007 were pretextual, plaintiffs rely on Obrey v. Johnson, 400 F.3d

6    691 (9th Cir. 2005), wherein the Ninth Circuit observed that "statistical data" can be used to

7    "establish a general discriminatory pattern in an employer's hiring or promotion practices,"

8    and that such a pattern, in turn, can "create an inference of discriminatory intent with

9    respect to the individual employment decision at issue."  See id. at 694.  Here, even

10   assuming each of the above-referenced four individuals is African-American and was in

11   some manner adversely affected by the elimination, plaintiffs have offered no statistical

12   data from which an inference of a general pattern of any type can be drawn, let alone a

13   pattern of discriminatory practices.

14        Accordingly, to the extent plaintiffs' claims are based on the Department's decision

15   not to promote Gainey in 2007, defendants have shown they are entitled to summary

16   judgment.

17                    **b.  Events Occurring Subsequent to Promotion**

18        On March 3, 2008, Siffermann promoted Gainey to the position of Supervising

19   Probation Officer.  (See Lucas Decl. Ex. 23 to Ex. E.)  As explained by Siffermann, he did

20   so in large part because, between the time of Gainey's non-selection in 2007 and his

21   ───────────────

22       [20]Plaintiffs offer no evidence that Holmes' employment with the City was terminated
     when the position of Director of Community Programs was eliminated or that Holmes'
23   salary was in any manner affected thereby.

24       [21]The evidence cited by plaintiffs for this proposition, specifically, Exhibit F to the
     Springman Declaration, does not support such a finding, nor refer in any way to such
25   employees.  Defendants, however, do not dispute plaintiffs' assertion that Supervising
     Counselor positions were eliminated; rather, defendants concede three Supervising
26   Counselor positions were eliminated in June 2008, but submit evidence, undisputed by
     plaintiffs, that no such employee was terminated by the City (see Magee Decl. Ex. E), that
27   the three Supervising Counselor positions were among five positions eliminated by
     Siffermann for budgetary reasons, and that the affected individuals were either to "continue
28   to work for Juvenile Probation in other capacities" or "move on to new opportunities with the
     City" (see id.).

selection in 2008, Gainey had "volunteered for special assignments and demonstrated strong leadership."  (See Siffermann Decl. ¶ 13.)

Plaintiffs argue that, after his promotion, defendants subjected Gainey to discrimination.

Specifically, plaintiffs argue, defendants discriminated against Gainey by requiring him to continue to perform the duties of his prior assignment after he was promoted.  With respect to this claim, defendants offer evidence that, prior to his promotion, Gainey had been working at an "offsite location" known as "the Principal's Center," a program in which 75 youths were enrolled, and that Gainey was asked to provide "coverage at the [Principal's Center] following his promotion until such time as a new probation officer could be identified and trained for the assignment."  (See Nance Decl. ¶ 15.)  Defendants submit evidence that Gainey "agreed to work in that capacity," and did so for one month, after which time he was injured and did not work in any capacity for the next eight months.  (See id.)  Plaintiffs offer no evidence to the contrary.  Moreover, to the extent plaintiffs may be suggesting that Gainey did not feel he could refuse to provide such interim assistance, plaintiffs fail to explain how the making of a request for such assistance gives rise to an inference of racial discrimination, and the Court finds it does not.

Plaintiffs also assert that Gainey was required to share a secretary with another supervisor, who also is African-American.  Assuming such assertion is intended by plaintiffs to state a distinct claim for discrimination,[22] and assuming, arguendo, that requiring an employee to share a secretary could constitute an adverse employment action for purposes of Title VII or FEHA, plaintiffs do not argue, nor does their evidence support a finding, that only African-American supervisors were required to share secretaries (see Springman Decl. Ex. G at 206), and, consequently, plaintiffs cannot establish a prima facie case of discrimination based thereon.  Cf., e.g., Hildebrandt v. Illinois Dep't of Natural

---

[22]In contrast to the other alleged discriminatory acts discussed herein, each of which is alleged in the complaint, the complaint includes no allegation that Gainey was required to share a secretary, much less that any such decision was discriminatory.

Resources, 347 F.3d 1014, 1034 n.14 (7th Cir. 2003) (holding where, in context of claim based on gender discrimination in form of hostile work environment, plaintiff asserted she had to share secretary, such assertion did not support plaintiff's claim because plaintiff failed to show she was "treated differently from her male coworkers with respect to [such sharing]").

Accordingly, to the extent plaintiffs' claims are based on events occurring after Gainey's promotion, defendants have shown they are entitled to summary judgment.

### c. Conclusion as to Discrimination Claims Brought on Behalf of Gainey

Defendants are entitled to summary judgment to the extent plaintiffs allege claims on behalf of Gainey.

### 2. Additional Arguments

Because, as discussed above, defendants have shown Gainey lacks sufficient evidence to establish that he was subjected to employment discrimination, the Court does not address herein defendants' additional arguments made in support of their motion.

## C. Plaintiff Oliphant

Plaintiffs allege that Oliphant, a Deputy Probation Officer, applied for and did not receive a promotion to the position of Supervising Probation Officer.  (See Compl. ¶¶ 13, 17, 21, 25.)

### 1. Sufficiency of Evidence:  Employment Discrimination

#### a. 2007 Failure to Promote

It is undisputed that Oliphant was ranked No. 2 on the DHR's "eligible list" issued April 17, 2007.  (See Horan Decl. Ex. A at 00089; Springman Decl. Ex. C.)

As discussed above, Siffermann, in 2007, selected four persons for the then available positions of Supervising Probation Officer.  In explaining why he did not select Oliphant at that time, Siffermann testified that Oliphant's "understanding of casework and casework supervision" was "inconsistent with what [Siffermann] thought was the best perspective to take."  (See Lucas Decl. Ex. D at 100.)  More specifically, Siffermann testified that during Oliphant's interview, the topic of "the role of the supervisor in providing

24

1   direction on the case and whose case it is and who is responsible" was discussed, and

2   Oliphant indicated, as described by Siffermann, that it was Oliphant's "belief that [the

3   cases] are not his cases, they are the probation officer's cases" and that "the individual

4   officer [ ] had the primary case decision-making authority," which belief, Siffermann

5   testified, was "not consistent with [Siffermann's] beliefs" as to "the role of a supervisor."

6   (See id. Ex. D at 70, 149.)  As Siffermann further explained, he "view[s] the role of a

7   supervisor" as "taking ownership and responsibility and [ ] feel[ing] that it [is] necessary in

8   those circumstances to affirm or question a judgment on a matter" (see id. Ex. D at 70),

9   and that "the supervisor is the person that has the final word on matters involving all the

10  cases in the unit" (see id. Ex. D at 149).

11      The Court finds Siffermann's stated reasons are legitimate and non-discriminatory.

12  Plaintiffs do not argue to the contrary; rather plaintiffs argue that, for the reasons discussed

13  above with respect to Gainey's non-selection in 2007, plaintiffs can establish such reasons

14  are a pretext for racial discrimination.  For the reasons stated above with respect to Gainey,

15  the Court disagrees.

16      Accordingly, to the extent plaintiffs' claims are based on the Department's decision

17  not to promote Oliphant in 2007, defendants have shown they are entitled to summary

18  judgment.

19                    **b.  2008 Failure to Promote**

20      In 2008, the Department had two openings for the position of Supervising Probation

21  Officer.  One of those positions was given to Gainey and the other to Richard Perino

22  ("Perino"), whom all parties describe as Caucasian.  Plaintiffs argue that defendants'

23  selection of Perino instead of Oliphant constituted racial discrimination.

24      With respect to this claim, defendants offer evidence, undisputed by plaintiffs, that

25  the position for which Perino was selected was Supervisor of the Department's "Courtroom

26  Officer Unit."  (See Siffermann Decl. ¶ 12.)  Defendants also offer evidence, undisputed by

27  plaintiffs, that the Supervisor of the Courtroom Officer Unit would "work in Courtroom 4 in

28  addition to his duties to manage the work of the court officers and perform other duties as

                                    25

1  assigned." (See Nance Decl. ¶ 12.)

2      Siffermann testified that Perino initially was selected for such supervisory position in

3  an "acting" capacity, because Perino had been working in that unit and had "demonstrated

4  the leadership capabilities that kept that division [the Courtroom Officer Unit] running," and

5  he had been "kind of the surrogate leader all along" because the prior Supervising

6  Probation Officer had, in Siffermann's view, "provided little or no leadership." (See Lucas

7  Decl. Ex. D at 105.)  Thereafter, Siffermann permanently filled the position with Perino

8  because, in Siffermann's assessment, the Courtroom Officer Unit, after Perino became the

9  acting supervisor, had a "tremendous turnaround in its response to the court." (See id. Ex.

10  D at 111.)  Specifically, under Perino's predecessor, "there wouldn't be a week that would

11  go by that [Siffermann] didn't receive some kind of complaint from the court," and that such

12  complaints stopped "right after [Perino] became acting supervisor." (See id. Ex. D at 112.)

13  When asked why he selected Perino for the permanent position, rather than Oliphant,

14  Siffermann testified at his deposition as follows:

15          Well, because of the period of time of candidacy after I had reached out to
          everybody and asked them to consider participating in any kind of initiative
16          that we would ask.  As future leaders of the court, [ ] Perino volunteered for
          everything.  [ ] Oliphant, it wasn't a matter of not volunteering, it was – on two
17          instances, it was, having been approached, and he declined to take part in it.
          So it [the selection of Perino] had to do with leadership initiative and working
18          together with the administration.

19  (See id. Ex. D at 112.)

20      The Court finds Siffermann's stated grounds for not selecting Oliphant as the

21  Supervisor for the Courtroom Officer Unit constitute legitimate and non-discriminatory

22  reasons for such decision.  Again, plaintiffs do not argue to the contrary; rather, plaintiffs

23  argue they can establish Siffermann's stated grounds are a pretext for racial

24  discrimination.[23]

25  //

26  ─────────────────

27  [23]To the extent plaintiffs, in relying on Siffermann's "dark side" comment, are
asserting they need not establish a claim under the McDonnell Douglas framework, the
28  Court, for the reasons stated above with respect to plaintiffs' claims brought on behalf of
Woodard, disagrees.

In support thereof, plaintiffs rely on the following evidence regarding Perino:
(1) Siffermann's testimony that he was aware of "hearsay" that Perino, before Siffermann became Chief Probation Officer, had been appointed as an acting supervisor and later was removed from that position because Perino had a "method of assigning cases" based on "race," and that Siffermann did not believe it was necessary to learn the "details of that decision" before appointing Perino to Supervisor of the Courtroom Officer Unit, which position did not involve the assignment of cases (see Springman Decl. Ex. F at 177-78);[24] (2) Siffermann's testimony that during Perino's interview for the supervisor positions that were available in 2007, Perino gave some answers that were "deficient," "superficial," and "inferior" (see id. Ex. F at 184-85); (3) Siffermann's testimony that he knew of "concerns raised about [ ] Perino by the prior director of probation services, Nancy Yalon," specifically, her concerns that Perino was "lax, not holding folks accountable" and was "giving people too much latitude" (see id. Ex. F at 106); and (4) Siffermann's testimony that Perino was the "first [person] [Siffermann] disciplined for insubordination to the court"; specifically, Siffermann suspended Perino for five days for "disrespect to the court" based on his "answering a cell phone and telling the judge to wait while he was before the bench" (see id. Ex. F at 108-09).

Although such information concerning Perino would not necessarily disqualify him as a viable candidate for the then available supervisor position, the Court finds the above-cited evidence, viewed in the aggregate and in the light most favorable to plaintiffs, is sufficient to raise a triable issue as to whether Siffermann's stated reasons for promoting Perino over Oliphant are pretextual.

//

//

---

[24]There is no evidence suggesting any such method of assignment was intended by Perino to provide preferred assignments to any particular individual or group of probation officers. In Siffermann's view, however, neither assigning cases based on the race of the probationer nor assigning cases based on a "rotation wheel" is an appropriate method of assignment. (See id. Ex. F at 106.)

1    Accordingly, to the extent plaintiffs' claims are based on a failure to promote

2  Oliphant in 2008, defendants have not shown that Oliphant has failed to raise a triable

3  issue as to whether discrimination played a role in such decision.

4              **c. Conclusion: Sufficiency of Evidence as to Discrimination**

5    To the extent plaintiffs' claims are based on the failure to promote Oliphant in 2007,

6  defendants have shown they are entitled to summary judgment; to the extent plaintiffs'

7  claims are based on the failure to promote Oliphant in 2008, defendants have failed to

8  show discrimination played no role in such decision.

9        **2. Additional Arguments**

10    Each of the five causes of action alleged on behalf of Oliphant is based on the same

11  alleged acts of discrimination.  Defendants argue that, irrespective of whether plaintiffs can

12  establish a claim of employment discrimination, defendants are entitled to summary

13  judgment on four of the five causes of action to the extent they are alleged on behalf of

14  Oliphant, for reasons specific to each such cause of action.  The Court next considers

15  these additional arguments as they pertain to plaintiffs' claim that the failure to promote

16  Oliphant in 2008 constituted racial discrimination.

17              **a. First Cause of Action**

18    In the First Cause of Action, plaintiffs, as noted, allege a violation of § 1983.

19                **(1) Siffermann**

20    Defendants argue that Siffermann is entitled to qualified immunity.

21    As discussed above, a government official is entitled to qualified immunity if the

22  official's conduct did not violate the plaintiff's constitutional rights, or, if a violation did occur,

23  the right violated was not clearly established.  See Pearson, 129 S. Ct. at 815.  In

24  determining whether either such circumstance has been established, the court "must

25  accept the facts in the light most favorable to the [p]laintiffs," and, with respect to the latter,

26  must "determine whether, in light of clearly established principles governing the conduct in

27  question, the [defendants] objectively could have believed that their conduct was lawful."

28  See Mena v. City of Simi Valley, 226 F.3d 1031, 1036 (9th Cir. 2000).

1    Here, defendants argue, "[p]laintiffs cannot prove that [Oliphant] suffered a

2   deprivation of rights secured to [him] by the federal constitution."  (See Defs.' Mot. at 16:5-

3   6.)  As discussed above, plaintiffs have demonstrated a triable issue of fact exists as to

4   whether discrimination played a role in Siffermann's decision not to promote Oliphant in

5   2008.  Defendants have not argued that, in the event a trier of fact could find Siffermann's

6   stated reasons for selecting Perino over Oliphant were pretextual in nature, the Court

7   nonetheless could find Siffermann entitled to qualified immunity.

8    Accordingly, to the extent the First Cause of Action is based on plaintiffs' claim that

9   the failure to promote Oliphant in 2008 constituted racial discrimination, defendants have

10   failed to show Siffermann is entitled to qualified immunity.

11   **(2)  The City**

12    Defendants contend plaintiffs cannot establish a civil rights deprivation claim against

13   the City, for the reason that plaintiffs lack evidence to demonstrate the discrimination to

14   which Oliphant is alleged to have been subjected was taken pursuant to a policy or custom

15   of the Department.

16    Again, as with the claims brought on behalf of Woodard, the complaint does not

17   allege the failure to promote occurred as a result of a departmental policy or custom, and,

18   again, defendants have offered statistics demonstrating that, during the period from July 1,

19   2006 through June 30, 2008, 58% of the persons promoted in the Department were

20   African-American and 33% of persons newly-hired for any position were African-American,

21   a percentage higher than for "any other racial or ethnic group."  (See Magee Decl. ¶ 14, Ex.

22   F.)  As discussed above, plaintiffs neither contest such statistical showing nor offer any

23   evidence suggesting the Department has a policy of failing to provide equal employment

24   opportunities for African-Americans, nor do plaintiffs, in their opposition, make any

25   argument as to why the City can be held liable on plaintiffs' claims under § 1983.

26    Accordingly, to the extent the First Cause of Action is brought on behalf of Oliphant

27   and against the City, defendants have shown they are entitled to summary judgment.

28   //

29

### b. Second Cause of Action

As discussed above with respect to Woodard, plaintiffs cannot establish as against Siffermann their Second Cause of Action, by which they allege a violation of Title VII.

Accordingly, to the extent the Second Cause of Action is brought on behalf of Oliphant and against Siffermann, defendants have shown they are entitled to summary judgment.

### c. Third Cause of Action

As discussed above with respect to Woodard, plaintiffs cannot establish as against Siffermann their Third Cause of Action, by which they allege a violation of FEHA.

Accordingly, to the extent the Third Cause of Action is brought on behalf of Oliphant and against Siffermann, defendants have shown they are entitled to summary judgment.

To the extent defendants argue plaintiffs' FEHA claim on behalf of Oliphant is barred because the complaint contains no allegation that Oliphant received a right-to-sue letter from the Department of Fair Employment and Housing ("DFEH"), the Court disagrees.  The instant matter is no longer at the pleading stage, and plaintiffs have offered evidence, undisputed by defendants in their reply, that Oliphant received a right-to-sue letter from the DFEH dated October 5, 2007, well before the instant action was filed.  (See Springman Decl. Ex. EE.)

### d. Fifth Cause of Action

Lastly, defendants argue they are entitled to summary judgment on plaintiffs' Fifth Cause of Action, by which plaintiffs allege a claim of intentional infliction of emotional distress.  Specifically, defendants offer evidence that Oliphant did not, prior to filing the instant action, or at any other time, present his tort claim to the City.  (See Rothschild Decl. ¶ 4.)  Plaintiffs offer no evidence to the contrary.

Accordingly, defendants are entitled to summary judgment on the Fifth Cause of Action.  See Crow, 222 Cal. App. 3d at 199; Ortega, 764 F.2d at 707.

//

//

30

**CONCLUSION**

For the reasons discussed above, defendants' motion for summary judgment is hereby GRANTED in part and DENIED in part, as follows.

1.  With respect to the claims brought on behalf of Woodard,

a.  to the extent the motion seeks summary judgment on the First and Fifth Causes of Action in their entirety, the motion is GRANTED,

b.  to the extent the motion seeks summary judgment on the Second and Third Causes of Action as alleged against Siffermann, the motion is GRANTED,

c. to the extent the motion seeks summary judgment on all claims that are predicated on denial of requests for personal leave, the motion is GRANTED, and

d.  in all other respects, the motion is DENIED.

2.  With respect to the claims brought on behalf of Gainey, the motion is GRANTED.

3.  With respect to the claims brought on behalf of Oliphant,

a.  to the extent the motion seeks summary judgment on the First Cause of Action as alleged against the City, the motion is GRANTED.

b.  to the extent the motion seeks summary judgment on the Second and Third Causes of Action as alleged against Siffermann, the motion is GRANTED,

c. to the extent the motion seeks summary judgment on the Fifth Cause of Action in its entirety, the motion is GRANTED,

d. to the extent the motion seeks summary judgment on all claims that are predicated on a failure to promote in 2007, the motion is GRANTED, and

e.  in all other respects, the motion is DENIED.

**IT IS SO ORDERED.**

Dated:  May 7, 2010

MAXINE M. CHESNEY
United States District Judge

31